2021 IL App (1st) 200771-U

No. 1-20-0771

Order filed October 13, 2021

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| CHRISTOPHER H. SMITH and SHEILA CANTRELL, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiffs, | ) | Cook County |
| | ) | |
| (Christopher H. Smith, Plaintiff-Appellee) | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIFTH THIRD MORTGAGE COMPANY; | ) | |
| SAFEGUARD PROPERTIES, LLC; MICHAEL REESE, | ) | |
| individually, d/b/a MWorks and as agents of Fifth Third | ) | |
| Mortgage Company and Safeguard Properties, LLC; | ) | |
| MONTRELLE REESE, individually, d/b/a MWorks and | ) | No. 15 L 5710 |
| as agents of Fifth Third Mortgage Company and | ) | |
| Safeguard Properties, LLC; DONALD HARDAWAY; | ) | |
| individually and as an agent of Fifth Third Mortgage | ) | |
| Company, Safeguard Properties, LLC, Michael Reese and | ) | |
| Montrelle Reese; and EDWARD STEED, individually | ) | |
| and as an agent of Fifth Third Mortgage Company, | ) | |
| Safeguard Properties, LLC, Michael Reese and Montrelle | ) | |
| Reese, | ) | |
| | ) | |
| Defendants, | ) | Honorable |
| | ) | Diane M. Shelley, |
| | ) | Judge presiding. |

(Safeguard Properties, LLC and Montrelle Reese,      )
Defendants-Appellants).                              )

---

JUSTICE BURKE delivered the judgment of the court.
Justice McBride and Justice Ellis concurred in the judgment.

## ORDER

¶ 1    *Held*: We reverse and remand this case for a new trial on the damages only where plaintiff's counsel made remarks during closing argument that were not supported by the evidence or the reasonable inferences therefrom, and those remarks deprived appellants of a fair trial on the damages. However, the trial court's allowance of an improper jury instruction on the Forcible Entry and Detainer Act (735 ILCS 5/9-101 *et seq.* (West 2014)) was error but not reversible, and the court properly admitted the testimony of a former employee of one of the appellants. Lastly, the court properly denied the appellants a setoff from plaintiff's compensatory damages award.

¶ 2    After Christopher H. Smith found Donald Hardaway and Edward Steed in his house, they told him they were there pursuant to a work order from Fifth Third Mortgage Company (Fifth Third), Smith's mortgage company. According to the mortgage entered into between Fifth Third, Smith and his wife, Sheila Cantrell, Fifth Third could inspect the property if it was vacant, abandoned or the loan was in default.[1] Additionally, Fifth Third could take reasonable actions to protect and preserve the property if it was vacant or abandoned. Fifth Third had hired Safeguard Properties, LLC (Safeguard) to perform inspection work at Smith's property and preservation work at the property if it was vacant. Believing that Smith's property was vacant, Safeguard outsourced preservation work to a vendor, MWorks, that was owned by Montrelle Reese. Montrelle's father Michael Reese was a supervisor for MWorks. Montrelle then gave the preservation assignment to two of his employees, Hardaway and Steed.

---

[1] In the record, Sheila sometimes is referred to as Sheila Cantrell and sometimes Sheila Cantrell-Smith. We will refer to her in subsequent references as Cantrell.

¶ 3    After Smith found Hardaway and Steed in his house, he and Cantrell sued Fifth Third, Safeguard, Michael, Montrelle, Hardaway and Steed for various torts claiming that, because he and his family lived at the house, it was not vacant and no one was authorized to be inside. During the course of litigation, Smith and Cantrell settled with Fifth Third, Cantrell then voluntarily dismissed any and all claims against the remaining defendants, and Smith voluntarily dismissed all claims he had against Michael. After a joint bench-and-jury trial, a jury found Safeguard and Montrelle liable and awarded Smith $526,050 in total damages, including $525,000 for the emotional distress that he experienced as a result of the incident. The trial court also found that Safeguard violated the Illinois Consumer Fraud and Deceptive Business Practices Act (Fraud Act) (815 ILCS 505/1 *et seq.* (West 2014)) and imposed $50,000 in punitive damages against the company as well as awarding Smith attorney fees and costs.

¶ 4    On appeal, Safeguard and Montrelle contend, among other claims of error, that the trial court erred by allowing Smith's counsel to present a closing argument to the jury that bore no relation to the incident in the case, that was not legally actionable and that had no support in the evidence. Although we do not find that Safeguard and Montrelle's other claims of error warrant a new trial, let alone are errors, we agree that certain remarks made by Smith's counsel during closing argument were not based on the evidence at trial or the reasonable inferences therefrom. While these remarks did not affect the jury's findings of liability, they could have impacted the jury's assessment of damages, and therefore, they deprived Safeguard and Montrelle of a fair trial on the issue of damages. Accordingly, we reverse and remand this case for a new trial on the damages only.

¶ 5                                    I. BACKGROUND

¶ 6    Safeguard is a nationwide company that provides inspection and preservation services on residential properties when the owners of those properties are delinquent or have gone into default on their mortgages, and the properties are vacant. Mortgage lenders and servicers, such as Fifth Third, hire Safeguard to protect their interests in those properties. In doing so, Fifth Third relies on a provision in its mortgage agreements that allow it to inspect a property if the property is vacant or abandoned or the loan is in default, and take reasonable actions to protect and preserve the property if it is vacant or abandoned. In doing inspection work, Safeguard ensures that the properties, whose owners are delinquent or have gone into default on their mortgages, are vacant. After such a determination, Safeguard's preservation services will secure the property by boarding up doorways, changing locks, winterizing the property and removing debris. Safeguard does not perform the inspection and preservation work itself, but rather contracts that work out to local vendors, such as Montrelle's company, MWorks, who then performs those services with its own employees, such as Hardaway and Steed.

¶ 7    In 2006, Smith and Cantrell executed a note secured by a mortgage owned by Fifth Third for a property located in Chicago. In 2012, a fire occurred at the residence, which completely destroyed the interior of the property and caused them and their children to leave the residence. In 2013, they began renovating the property, and they began to have some financial issues.

¶ 8                                  A. Pretrial

¶ 9    In April 2017, Smith and Cantrell filed their operative fourth amended complaint. Therein, they alleged that, in August 2013, they spoke to Rico Elijah, a loss mitigation specialist for Fifth Third, who told them that, in order to avail themselves of financial assistance options on their mortgage, they had to reside at the residence. The following month, Smith, Cantrell and their two children moved back into the residence. Afterward, Smith and Cantrell began receiving notes from

Fifth Third that their property was vacant and to contact Fifth Third about the issue. Smith contacted Elijah in November 2013 and informed him about the notes. Elijah told Smith that he would take care of the vacancy issue. After this conversation, Smith and Cantrell placed a note on their doors, part of which was directed to law enforcement and stated that the residents of the property were currently involved in civil action regarding the ownership and occupancy of the residence and they were therefore "not trespassing." The other part of the note was directed at "the bank, it's agents [*sic*] and the public" and stated that no one was allowed to enter the home without the permission of the residents.

¶ 10    In January 2014, Smith and Cantrell's residence was secured by a home security alarm system and doors whose locking mechanisms were all working. They alleged that, on January 31, 2014, Fifth Third, by and through its agents, Safeguard, Michael, Montrelle, Hardaway and/or Steed communicated with an individual named "James" who identified himself as a tenant of the residence and relayed that the property was currently occupied. Smith and Cantrell further alleged that, on the same date, Fifth Third, by and through its agents, Safeguard, Michael, Montrelle, Hardaway and/or Steed spoke with a neighbor of the property, who also relayed that the property was occupied and instructed Fifth Third and its agents not to remove any items from inside.

¶ 11    Later that day, Smith received a notification from his home security system that someone was in his house. When Smith drove to his property, he observed two individuals inside who identified themselves as Hardaway and Steed, and told Smith that they worked for Michael. Hardaway and Steed told Smith that they were at the residence at the behest of Fifth Third to secure the property after the current owners lost the property through foreclosure. Smith asked them for official documentation to this effect, but Hardaway and Steed could not produce anything except a " 'work order.' " In order to verify their information, Smith had Hardaway and Steed call Fifth

Third. Although a representative of Fifth Third confirmed that the property had been transferred to it through foreclosure, the representative could not find any official documentation. Smith talked to Fifth Third's representative, said that he was the actual owner and remarked that he was entitled to live at the residence. Nevertheless, the representative told him that, although there was apparently no order of possession on file, Fifth Third "still had the right to secure the property because it was 'vacant.' " Following the incident, Smith observed damage to his residence, including broken doors, door frames and locks, vandalized mechanicals and that a foreign substance had been poured down a sink. Additionally, Smith noticed that several personal items were missing, including tools and some copper piping.

¶ 12     In light of these alleged actions, Smith and Cantrell brought several causes of action against the various defendants. Against Fifth Third, they brought actions for breach of contract, negligence, a violation of the Fraud Act (815 ILCS 505/1 *et seq.* (West 2014)), trespass and invasion of privacy premised on an intrusion upon seclusion. Against Safeguard, Michael, Montrelle, Hardaway and Steed, Smith and Cantrell brought actions against each of them for negligence, a violation of the Fraud Act, trespass, invasion of privacy premised on an intrusion upon seclusion and conversion. Relevant to the issues on appeal, in Smith and Cantrell's intrusion upon seclusion claims, they sought damages for emotional distress for the mental anguish and suffering incurred by them due to the misconduct of Fifth Third, Safeguard, Montrelle, Michael, Hardaway and Steed. And in their Fraud Act violation claims, they sought punitive damages. Smith and Cantrell also sought the award of attorney fees and costs.

¶ 13     In February 2019, Smith, Cantrell and Fifth Third reached a settlement agreement. The following month, the trial court entered an agreed dismissal order that dismissed Fifth Third from the litigation. In an answer filed by Safeguard, Michael, Montrelle, Hardaway and Steed

(collectively, defendants), denied any liability for the entrance into Smith and Cantrell's residence on January 31, 2014, and any liability for any resulting damages. Additionally, defendants issued a subpoena to Fifth Third seeking to have the amount of the settlement with Smith and Cantrell disclosed so that they could file an affirmative defense for a setoff. However, Fifth Third moved to quash the subpoena, wherein it noted that counsel for Smith and Cantrell refused to agree to disclose the settlement amount. As such, Fifth Third argued it could only disclose the settlement pursuant to a court order. Thereafter, defendants filed a motion to compel the disclosure of the settlement and for leave to file the affirmative defense of a setoff. The trial court granted their motion to compel and allowed them leave to file the affirmative defense.[2] Subsequently, defendants filed a joint affirmative defense asserting that any verdict rendered by a jury must be reduced by the amount of the settlement agreement between Smith, Cantrell and Fifth Third.

¶ 14    Prior to trial, the parties filed various motions *in limine*. In one filed by defendants, they sought to bar the opinion testimony of Kevin Kubovcik, a former employee of Safeguard, who had not worked at the company in four years. According to defendants, Kubovcik would testify that Safeguard's vendors were not properly trained or supervised, and what constituted a violation of Safeguard's protocols. Defendants posited that Kubovcik was never disclosed as an expert witness, so he could not properly offer his opinions. In addition, they argued that his testimony was irrelevant and unduly prejudicial given that he had not worked at Safeguard in four years and was not responsible for training or supervising others. Moreover, defendants argued that Kubovcik had no knowledge about the specific incident at issue in the case, no knowledge about Safeguard's current vendors and no knowledge about any of Safeguard's current policies. Smith and Cantrell,

_____

[2] The settlement agreement has been provided under seal to this court.

however, argued that other evidence showed Safeguard had not changed their customs or practices since Kubovcik left and the incident at issue in the case was not a unique occurrence.

¶ 15    The trial court rejected defendants' argument that Kubovcik was being offered as an expert witness and instead noted that he would testify about his experience working at Safeguard. The court determined that Kubovcik could only testify properly if Smith and Cantrell could establish "that the practice that occurred during [his] employment was the same practice or policies employed at the time of the occurrence." As such, the court reserved ruling on the motion *in limine* until after Smith and Cantrell had an opportunity to lay a foundation that "the practice or policies [of Safeguard were] still the same." The court concluded that, if they could, Kubovcik could testify.

¶ 16    Later, Cantrell voluntarily dismissed her claims against defendants. And Smith voluntarily dismissed his claims against Michael. The case ultimately proceeded to a joint bench-and-jury trial against Safeguard, Montrelle, Hardaway and Steed. A jury heard Smith's claims against defendants for negligence, trespass, intrusion upon seclusion and conversion. And the trial court heard Smith's claims against defendants for violations of the Fraud Act.

¶ 17                                B. Trial

¶ 18                        1. Smith's Case-in-Chief

¶ 19    In Smith's case-in-chief, the evidence showed that the property at issue was located in Chicago and owned by Smith, a Cook County deputy sheriff, and his wife, Cantrell. The couple had two children living with them. In 2006, they purchased the property, which was a two-flat apartment, with one unit on the second floor, one unit on the first floor and a basement that had storage, a laundry room and a recreation room. In 2012, there was a fire in the house that completely destroyed its interior, resulting in the family losing nearly all of its possessions. The

fire forced them to temporarily move and buy new possessions, which caused them to be stretched thin financially. Around January 2013, they began renovations at their property.

¶ 20    During the time Smith and his family were displaced from their home, he reached out to Fifth Third, his mortgage company, for financial assistance. An employee of Fifth Third, Rico Elijah, told him that his only option was partial forbearance, which required him to actually miss a payment. In accordance with Elijah's instruction, Smith missed his next mortgage payment and was able to get forbearance. Smith spoke to Elijah again about extending the forbearance, and Elijah stated that, in order to receive an extension, Smith and his family would have to move back into the property. In accordance with Elijah's instruction, Smith and his family moved back into the property around September or October 2013. Although the house was still in the process of being renovated, the renovations on the first floor were complete so Smith and his family were able to live there while the remaining renovations were being completed.

¶ 21    After Smith and his family had moved back into the house, Smith noticed door hangers on the doorknobs of his house, which meant that someone thought his house was vacant. So Smith called Elijah to discuss the hangers as well as his mortgage payments. Elijah told Smith not to "worry about it" and that he would "take care of" the situation. Elijah further instructed Smith to continue making his "forbearance payments." However, according to Smith, more door hangers appeared, so he contacted Elijah again, who maintained that he was taking care of the issue. In January 2014, as a result of the conversation, Smith put his own sign on his doors that stated:

"RESIDING IN THIS PROPERTY ARE INDIVIDUALS CURRENTLY

INVOLVED IN CIVIL ACTION IN THE CIRCUIT COURT DISPUTING

OWNERSHIP AND OCCUPANCY OF THIS PROPERTY UNDER CASE #2011

CH 11477. THEREFORE, THE RESIDENTS OF THIS HOME ARE NOT TRESPASSING.

\*\*\*

TO THE BANK, IT'S AGENTS [*sic*] AND THE PUBLIC: NO ONE IS ALLOWED TO ENTER INTO OR UPON THESE PREMISES WITHOUT THE EXPRESS PERMISSION OF THE RESIDENTS.

VIOLATORS WILL BE PROSECUTED TO THE FULLEST EXTENT OF THE LAW."

At trial, Smith stated the subject matter of the lawsuit with the caption "2011 CH 11477" was "[f]oreclosure proceedings," but conceded that the actual lawsuit had been dismissed in May 2012.

¶ 22    Smith testified that, from 2013 to 2014, his property was undergoing renovations. And he presented photographic evidence to that effect, including photographs that appeared to show new windows and doors, tools inside, lights on and the presence of a full dumpster on the exterior of house. Additionally, he testified that, in November 2013, the renovations were still ongoing at the property and he identified a photograph of the second floor showing those renovations and the lights on. Although Smith did not obtain permits from the City of Chicago himself for the renovations, he asserted that his contractors did. And Smith identified multiple permits from the City of Chicago authorizing the renovations, including a permit dated January 3, 2014.

¶ 23    Additional evidence showed that Safeguard operated nationally and performed property inspection and preservation work at the direction of its clients, such as Fifth Third. The role of property inspectors was to visit properties, inspect them and determine whether they were occupied. The role of property preservationists was to perform maintenance on properties in order to preserve and protect them. This work would include mowing the grass, boarding up houses and

winterizing houses, which involved draining pipes and inserting antifreeze. According to Steve Meyer, Safeguard's vice president, the company had training manuals written specifically for property inspectors and property preservationists, and during 2013-2014, the manuals in effect were the 2011 editions. Meyer testified that, since 2009 and continuing into 2014, Safeguard developed more robust training materials for its vendors by including video training and utilizing other technological advances. Although Meyer asserted that Safeguard's vendors were independent, the company did provide "some training and guidance" to them and provided them the training manual, which they were expected to follow.

¶ 24    The training manuals listed a number of criteria that vendors were to utilize to determine if a property was vacant, which Safeguard supplemented with various memorandum and videos. These criteria included whether the utilities were on, whether the lights were on, whether the property was being renovated, whether there were people inside, whether there were personal items in plain sight inside the property and whether there were personal items on the exterior of the property. However, evidence of renovations was not conclusive, as a property could appear in the process of being renovated but nevertheless still be vacant such as when the renovation work had stopped at some time before the inspection. To this end, Steed testified that if workers were not present performing renovation work, this could be a sign that the work had stopped. Additionally, Safeguard's vendors considered whether the lawn was maintained in warmer months, whether snow had been removed in colder months, whether there was excessive mail gathered outside the house and whether there was excessive amounts of debris in the yard. At trial, Meyer agreed that, while not specifically listed in the manual, if a home security alarm became activated, that could be an indicator that the property was occupied. However, Montrelle estimated that 5 to 10 percent

of properties he visited had alarms yet were still vacant, so while an alarm could indicate that a property was occupied, it was not conclusive.

¶ 25    Safeguard utilized both contact and no-contact inspections, the latter wherein its inspectors did not attempt to contact anyone inside. But in a contact inspection, Safeguard's inspectors were expected to knock on the door of the residence. After inspectors performed their inspections, they sent their findings to Safeguard. Although the critical role of property inspectors was to determine a property's occupancy status, Safeguard's property preservationists were likewise expected to determine whether a property was occupied before doing any work. For property preservationists, they would receive a work order from Safeguard that detailed the specific work to be performed at a property—though the specific requests would originate from Safeguard's clients. And many of these tasks were discussed in Safeguard's training manual, such as how to change the locks of a property and how to winterize a property. According to Meyer, Safeguard's manual instructed its vendors to call the company if they had any concerns about a property's occupancy status.

¶ 26    One of the vendors that Safeguard used was MWorks, a company that was created in 2010 as sole proprietorship by Montrelle but later incorporated. Before MWorks received any work orders from Safeguard, Montrelle had to undergo various training, including field training with current vendors and a field inspector. Montrelle received Safeguard's training manual, training videos and supplemental memorandum, which helped him learn the proper way to determine a property's occupancy status and perform preservation tasks. Following completed work orders, Safeguard's employees would check the work orders and photographs submitted with those work orders to ensure that MWorks completed the job properly. According to Montrelle, if a vendor did not follow Safeguard's guidelines, it would not be paid for the work performed. When Montrelle or MWorks' employees did not complete a job properly, Safeguard would inform Montrelle.

¶ 27    One of MWorks' supervisors was Michael, Montrelle's father, and he had performed preservation work over the years. In order to winterize a property, Michael would sometimes pour antifreeze down sinks, and he received training from Safeguard on how to board up doors and how to enter a house through a locked door. But Michael never received any feedback directly from Safeguard, rather Safeguard communicated only with Montrelle. At trial, Michael described his process of going to a property after receiving a work order. First, he would read the work order from Safeguard, which instructed him on what needed to be performed at the property. Once Michael arrived at the property, he would inspect the exterior visually and look at whether the grass was long, if there was mail piling up on the porch, if there were broken windows, if any doors were boarded up or if any lights were on. Additionally, Michael would check to see if there was water and electricity going to the house. If Michael observed people renovating the house from outside, he would consider this fact in determining the property's occupancy status. After performing a visual check, Michael would ask neighbors about the property. Michael testified that, according to his training, if a security alarm was activated at a house, he was supposed to "resecure the lock" he had broken to enter the property, "call Safeguard from the property" and wait outside until further direction because an alarm could indicate that the property was occupied.

¶ 28    Hardaway and Steed were also employees of MWorks. According to Montrelle, he trained them using the training materials he received from Safeguard, including on how to determine if a property was occupied. Additionally, they spent three weeks with Montrelle in the field performing work and then Montrelle shadowed them for a week before they were able to begin working independently. Montrelle asserted that employees of MWorks would "always" talk with the neighbors of a property as part of their process to determine if a property was occupied in addition to utilizing the criteria from Safeguard. His employees would also look for the presence of vacancy

stickers, which were notes close to the size of an index card that were placed on doors and windows of properties that were vacant. These stickers would provide Safeguard's name, a telephone number and state that Safeguard had determined the property was vacant. Montrelle asserted that MWorks "always erred on the side of caution" and if there was ever a question about a property's occupancy status, his employees would report the property as occupied. Throughout his time working as a vendor for Safeguard, Montrelle never once saw a court order authorizing his or his employees' presence at a property.

¶ 29    Evidence elicited at trial showed that, beginning on February 17, 2013, Safeguard began conducting visits at Smith's house. During this first visit, which apparently was performed by MWorks, its employees determined that the property was occupied. Following that first visit, Safeguard's vendors deemed the property to be vacant on every single visit—20 total times—until January 7, 2014, when the property's occupancy status was deemed unknown. Following January 7, 2014, the property was deemed vacant five more times until its occupancy was deemed unknown on January 28, 2014. And, on January 30, 2014, the property's occupancy status was deemed vacant. According to Meyer, when a property's occupancy status was deemed unknown, that usually meant that Safeguard's work order had been cancelled. At trial, Meyer acknowledged a Safeguard business document about the subject property that contained a notation about an October 3, 2013, e-mail that stated: "We actually received an e-mail yesterday in regards to the occupancy of the property. It looks as though the borrower is currently living at the property, so there is no need to change anything or order any secure. Sorry about the confusion, but yes, you can remove

the flag from your system." It is unclear who made the notation or sent the referenced e-mail, as this exhibit was not included in the record on appeal.[3]

¶ 30    On January 31, 2014, Smith's children left for school around 7:30 a.m., his wife left for work around 9 a.m. and he left for work around 11 a.m. Prior to leaving for work that day, Smith activated his home security alarm system, which he operated through his phone. In the afternoon, Steed and Hardaway went to Smith's house pursuant to the work order from Safeguard, which was based on a request from Fifth Third. The work order instructed Steed and Hardaway to determine the property's occupancy status before performing any work and did not authorize them to remove any personal items from Smith's house. The work order directed Steed and Hardaway to change the locks of the property if it was vacant and "winterize" the property, meaning to drain water from the pipes and put antifreeze inside. Additionally, the work order, and all work orders from Safeguard, contained an "apology letter" that Steed and Hardaway were supposed to place on the kitchen table if they entered the house under the belief that it was vacant but later realized it was actually occupied. The purpose of the apology letter was so the occupants of wrongly entered houses could call Safeguard to resolve any damages that had been sustained after its vendors entered the property. The only information Steed and Hardaway had about Smith's property was contained in that work order.

¶ 31    Initially, when Hardaway and Steed arrived at Smith's property, they parked their company-owned van in front of Smith's house and attempted to determine whether the property

---

[3] This exhibit and all of the exhibits entered into evidence during the trial were not included as a separate record on appeal. However, one of the exhibits—Plaintiff's Exhibit No. 22—was included as an exhibit in a posttrial filing. Safeguard and Montrelle, as the appellants, have the burden to present a sufficiently complete record of the proceedings to support a claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). Any doubts arising from the incompleteness of the record in this regard will be resolved against them. *Id.* at 392.

was occupied. They rang the property's doorbell, knocked on the door and looked through the windows, but no one answered. Neither Hardaway nor Steed noticed any signs on the exterior of the house. Steed began taking photographs of the exterior of the house while Hardaway attempted to talk to the neighbors. One neighbor did not answer his or her door, but Hardaway spoke to another neighbor. Based on Steed and Hardaway's visual inspection of the property and Hardaway's conversation with the neighbor, they believed the property was vacant. They then moved their van to the back of the property and approached the basement door. There, Hardaway drilled through the lock of a door, which caused the door to open. After they gained access to the basement, a security alarm went off. Steed and Hardaway continued into the basement, where Hardaway attempted to find the security panel to deactivate the alarm. Hardaway knew how to disable most security alarms based on training he received from Montrelle. Hardaway found the panel in the mechanical room of the basement, but the alarm was more sophisticated than he was used to, so he was not able to deactivate it. At some point, the alarm became silent.

¶ 32    While Steed and Hardaway were at Smith's house, Carolyn Crump, one of Smith's neighbors, had just returned from work and observed a man standing next to a chain-link fence at Smith's house with piping and possibly components from a water heater by his feet. Crump asked the man what he was doing, and he responded that he was "from the bank." Crump replied and asked what he was doing there, but the man told her to mind her own business. Crump also saw another man, but could only see the top of his head because he was down by the basement of Smith's house. Crump then went into her own house and called Smith because she thought his house was being burglarized. At trial, Crump testified that she could not recall Smith's family moving personal belongings or furniture back into the house after the fire.

¶ 33 After Smith received an alert on his phone that his security system had been activated and the phone call from Crump, he drove home. Once he arrived, he noticed a white van behind his property and his basement door wide open. Smith walked into the basement and drew his service weapon on Hardaway and Steed. One of them informed Smith that they were "from the bank" and there only to secure the property. Neither of them were in any official uniform or had anything on them to identify themselves in an official capacity. Although MWorks had company-issued t-shirts, it did not have jackets or hats. According to Steed, he was required to wear a uniform while on the job for MWorks, which was easier in the summer when he could just wear the company-issued t-shirt. However, in winter, he would just dress to stay warm. Additionally, during Meyer's testimony, he acknowledged that Safeguard's training manual required its vendors to dress professionally and have identification on them to show they were working in a professional capacity.

¶ 34 After encountering Steed and Hardaway, Smith handcuffed them together and called the police. According to Smith, one of Hardaway or Steed told him that they had received a "work order that the owner lost the property in a foreclosure," and they were there helping to prepare the property for a sale. Smith asked them if they had a court order to be at his residence or any documentation to show that the owner had lost the property through foreclosure, and they told him they did not, but that they would have the documentation in the office. Hardaway called Michael and then Safeguard. Shortly after, the police arrived and told Smith to uncuff the men. The responding officers did not know how to handle the situation, so they called in a supervisor, who let Hardaway and Steed leave the residence. According to Hardaway, the police conducted a search of their white van. Michael came to the property and also told Smith that the owner of the property lost it through foreclosure, and Hardaway and Steed were there pursuant to a work order. Neither

Hardaway nor Steed had the official work order from Safeguard, only an unofficial handwritten version. Likewise, according to Smith, Michael could not produce the work order and stated he was "having a hard time *** tracking it down." Before Michael, Hardaway and Steed left Smith's residence, they offered to repair what had been damaged. Although they attempted to fix the exterior basement door, Smith did not believe it was truly fixed.

¶ 35    Following the incident, Smith called his wife and instructed her and their children not to come home because "it wasn't safe" in light of the exterior basement door being unsecured. Smith, however, stayed at the house overnight. While at the house, he realized it was cold in the basement and discovered that the circuit board to the furnace had been removed from inside the unit. Additionally, in the laundry room, Smith observed that the utility sink had a blue substance coming out of the drain. Further, Smith noted that one of the alarm system's sensors had been taken down, that he was missing a bag that contained various tools of his and some copper piping that was in the utility room was missing. At trial, Smith estimated that the reasonable price of the missing tools was between $700 and $725. Concerning the sink and damage to the door, Smith entered into evidence various invoices from contractors to fix these issues, which totaled $1635. Additionally, at trial, Hardaway and Steed denied taking any personal items from Smith's house, denied doing anything to the furnace, denied pouring any substances down any sinks in the basement and denied mentioning anything to Smith about his house being under foreclosure. Hardaway asserted that, when winterizing a property, Safeguard required him to use a pink antifreeze. Steed also denied being approached by any neighbors while at the property. All of the witnesses testified consistently that they did not see a court order authorizing anyone's presence at Smith's house that day. Smith testified that there were no active foreclosure proceedings on his property, and no witnesses testified to such knowledge.

¶ 36    Smith testified that the January 31, 2014, incident caused him and his family "a lot of stress" and "anxieties." In particular, Smith's daughter questioned why the incident happened, and his son was frequently worried that a stranger would come into the house. Additionally, Smith and his wife fought because she did not feel safe at home and wondered how he could protect the public, but not his family. As of result of their marriage suffering, he attended counseling. According to Smith, he and his family had "constant fear" over the sanctity of their house, which caused many sleepless nights and forced the family to buy a dog. Smith lamented that he and his family did "everything that we were supposed to" by staying at the property to obtain forbearance but "they still sent people out and they still [had] people coming out" to the house after January 31, 2014, which he knew because he "still saw door hangers." Approximately 18 months after the incident, Smith and his family moved out of the house, which was the result of the anxiety "and to save [their] marriage and get [his family] safe." Despite moving, Smith still was afraid that someone was going to break into his house.

¶ 37    During Smith's testimony, his counsel had him review Plaintiff's Exhibit No. 22. This exhibit, which was admitted into evidence, was a computer-generated spreadsheet maintained by Safeguard in the regular course of business that listed every work order at Smith's house and the occupancy status that its vendors determined following the visit. Along with this information, there was also a cost to Safeguard to contract out the work order to its vendors. According to Meyer, when the occupancy status was deemed unknown and there was no cost associated with the work order, that usually meant that the work order had been cancelled. Plaintiff's Exhibit No. 22 indicated that, after January 31, 2014, Safeguard issued 142 work orders for Smith's property, spanning from February 2014 to May 2017. Safeguard's vendors deemed the property as occupied the majority of the time. Based on Meyer's review of the spreadsheet, he "believe[d]" that a couple

of the work orders after January 31, 2014, had been "canceled." When Smith reviewed the exhibit at trial, his counsel asked him approximately how many inspections were listed on each page. Smith responded that there were 20 to 25 inspections on seven pages of the spreadsheet. Counsel then asked Smith what was 7 times 25 to which Smith responded 175. Thereafter, counsel asked if "it look[ed] like Safeguard sent people to your house 175 [times] after they broke in?" Smith responded yes, at which point defendants' counsel successfully objected to the question.

¶ 38     Additionally, in Smith's case-in-chief, he called Kevin Kubovcik as a witness, the former Safeguard employee. Before Kubovcik testified, defendants renewed their motion *in limine* to bar his testimony. The trial court noted that it had reserve ruling on the issue to provide Smith's counsel an opportunity to lay a foundation for Kubovcik's testimony about Safeguard. Although defendants' counsel objected at various points during Kubovcik's testimony about the relevancy of his statements regarding Safeguard, the court allowed Kubovcik to continue testifying.

¶ 39     Kubovcik testified that he worked for Safeguard as a claim resolution specialist in its legal department from December 2007 until April 2010. He conceded that he did not like working at Safeguard and was sued by the company after he left for violating a confidentiality agreement. Kubovcik's main role was to investigate claims against Safeguard and its vendors from all across the country. The complaints would be initiated with the customer service department, and then Kubovcik, as part of the legal department, would investigate them. In his role, Kubovcik interacted with the property inspection department and property preservation department. Kubovcik knew the standards by which Safeguard's vendors were trained, but stated that Safeguard never followed up with them to see if they were following the training. Although Kubovcik acknowledged he was not involved in training any of Safeguard's vendors, he claimed that he knew they were not trained properly. Kubovcik explained that, as part of his investigation of complaints, he would have to

determine the level of training of vendors to perform their duties and would often interview people in the vendor management department to discern how the vendors had been chosen.

¶ 40    Kubovcik further testified that Safeguard's property preservation vendors were required to follow its training manuals and supplemental memorandums. And one of the expectations of property preservation vendors was to be easily identifiable by the public, which required them to look "official" by wearing an identification, a logo or a badge. Kubovcik asserted that, if a vendor went to a house and observed a sign on a door that indicated a family was residing inside but still went inside the house, that would not meet the expectations of Safeguard. According to Kubovcik, from what he could recall, the proper procedure in such a situation would be for the vendor to photograph the note, send it to Safeguard and suspend his activities until Safeguard approved the continuation of work. Kubovcik also added that, based on Safeguard's policies, it would be improper to enter a residence after a home security alarm was activated and to enter a residence without a proper uniform and identification. Additionally, Kubovcik stated that it would be improper for vendors to take anything from a residence, as work orders prohibited such actions. However, Kubovcik conceded that he did not have any personal knowledge of any changes made to Safeguard's policies or access to its training manuals since he left the company in April 2010, including the 2011 editions of the training manuals.

¶ 41                          2. Defendants' Case-in-Chief

¶ 42    Adan Garcia, an asset preservation coordinator for Fifth Third, testified that his work involved issuing orders to secure and maintain properties. If a borrower defaulted on his loan or went into delinquency on the loan, this would cause Fifth Third to perform an inspection of the property to determine whether it was occupied. Fifth Third would secure properties that were in "a delinquency phase," but only if the property were deemed vacant. Garcia would issue a secure

order after reviewing inspection reports of the property, which were compiled by Fifth Third's contractors, such as Safeguard. Garcia communicated with Safeguard regarding Smith's property and identified an e-mail chain from January 13, 2014, between him and employees of Safeguard. In the e-mail, Safeguard instructed Fifth Third to "remove flags in their system of completing no preservation work." In response, Garcia directed Safeguard to remove "the flag" on Smith's property and that he would review the property to determine whether it should be secured. On January 24, 2014, after reviewing various inspection reports from Smith's property, Garcia told Jennifer Thompson, of Safeguard, to secure Smith's property "only" if it was vacant.

¶ 43    Janna Hairston, a litigation portfolio analyst for Fifth Third, testified that she managed contested foreclosure and litigation accounts for the bank. During her testimony, Hairston identified an exhibit as a copy of the mortgage entered into between Smith, Cantrell and Fifth Third. In the mortgage, Hairston noted that it stated: "Lender may inspect the property if the property is vacant or abandoned, or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned property." She further read from the mortgage, which stated that the mortgage was governed by federal law and the law of the jurisdiction in which the property was located. Additionally, Hairston discussed Fifth Third's internal system that housed all servicing notes on a particular mortgage, including all communications regarding that mortgage between the bank and the borrower. In reviewing Smith's file, she noted that Smith had defaulted on his loan. At trial, Hairston read some of the notes from Fifth Third's internal system that included notations that Smith and Cantrell were delinquent on their loan in November and December of 2012 and January 2013. Hairston also read another note regarding a conversation between Fifth Third and Smith on December 17, 2013, which indicated that Smith was "uncooperative and did not want to discuss the loan." According to the note, when Smith was

asked about the occupancy of his property, "[h]e refused" to answer. This note did not identify the name of the person who spoke to Smith. Hairston acknowledged that, in the system, there were references to Rico Elijah, a specialist in the loss litigation department of Fifth Third. Hairston had never seen a court order allowing Fifth Third, Safeguard or MWorks to enter Smith's property.

¶ 44   Steve Meyer was also called during the defendants' case-in-chief and testified that, between 2009 and 2014, there were substantial changes in Safeguard's training, including utilizing videos, amending memorandum and altering the training manuals. Meyer testified that Safeguard would have no concerns if its vendors wore coats when it was cold outside. Meyer further testified that, in September 2013, Safeguard issued a memorandum effective immediately that required its vendors to wear identification badges while performing preservation work.

¶ 45   Sergeant Vincent Allen of the Chicago Police Department was one of the officers that responded to Smith's property on January 31, 2014, and noted that the property was partially boarded up when he arrived. He reviewed the work order that Steed and Hardaway showed him. Based on his review of the work order, Sergeant Allen believed that they had a legitimate reason for being at the property and ultimately, Steed and Hardaway were not arrested. Sergeant Allen did not see any signs that any personal property was stolen or damaged, and he did not observe any copper piping or mechanical parts on the ground. At trial, Sergeant Allen noted that, if there was any suggestion that Steed or Hardaway had stolen anything from Smith's house, he or other officers would have looked in their van to see if any of those goods were inside.

¶ 46   Smith was also called during defendants' case-in-chief and testified that the counseling he and Cantrell participated in was conducted at their local church. They began counseling in the fall of 2012, around the time when the fire destroyed their home, and they concluded counseling sometime in 2015. Sometimes they would have scheduled appointments and other times, they

would spontaneously ask to speak with someone at the church. They would talk to the pastor, ministry leaders and even friends from the church. At trial, when Smith was asked if he spoke to these people about the January 31, 2014, incident, Smith responded "I don't recall." When asked if he ever fell behind on his mortgage payments, Smith testified that he paid what Fifth Third told him to pay, and he did not believe he was in default on his mortgage in January 2014. Smith further stated that he and his family did not stay at the house every night and would still spend some time sleeping at the houses of family. Lastly, Smith stated that, when he noticed some of his personal items were missing, he did not report it to the police because he "didn't think it was necessary."

¶ 47                                3. Jury Instructions

¶ 48    During the jury instructions conference, Smith's counsel proposed Plaintiff's Instruction No. 28, which stated:

> "There was in force in the State of Illinois, at the time of the occurrence in question a certain statute which provided that:
>
> > 'no person shall make entry into lands or tenements except in cases where entry is allowed by law, and in such cases, he or she shall not enter with force, but in a peaceable manner.' Illinois Forcible Entry and Detainer Act, 735 ILCS 5/9-101.
>
> If you decide that a party violated the statute on the occasion in question, you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a party was negligent before and at the time of the occurrence."

This instruction was modeled after Illinois Pattern Jury Instructions, Civil, No. 60.01 (revised Dec. 2011) (hereinafter IPI Civil No. 60.01).

¶ 49 Defendants' counsel objected to the instruction and argued that the statute involved evictions, which was not at issue in the present case. The trial court remarked that the statute "refer[red] to self-help in the State of Illinois. Self help is the prohibition that this statute is designed to address. It also sets forth the mechanisms for proper eviction." As the court was about to allow the instruction, it stated that it would review the statute again. Smith's counsel interjected and highlighted *Fortech, L.L.C. v. R.W. Dunteman Co., Inc.*, 366 Ill. App. 3d 804 (2006), which counsel observed provided a comprehensive discussion of the statute. The court then ruled that it would allow the instruction, but was willing to revisit its ruling if defendants' counsel provided the court with additional information after a recess.

¶ 50 Following a recess, defendants' counsel renewed the objection to Plaintiff's Instruction No. 28 and argued that, based on *Fortech*, the purpose of the statute was to resolve disputes over the possession of property. Counsel observed that there was no dispute who owned the property in question and that Smith and Cantrell possessed the property during the relevant time period. Counsel accordingly contended that the statute was irrelevant to the litigation. In response, the trial court asserted that the statute was "the only method allowed for in Illinois to enter onto property that another person has possession of. There's no such thing as self-help in Illinois." The court continued and observed that the Forcible Entry and Detainer Act (Forcible Entry Act) (735 ILCS 5/9-101 *et seq.* (West 2014)) was intended "to prevent exactly what occurred" in the present case. The court remarked that the policy behind the statute was to "encourage people who believe they have the right to enter onto someone else's property to seek leave of court." The court maintained that the instruction was proper and continued to allow it.

¶ 51 D. Closing Argument

- 25 -

¶ 52    In Smith's closing argument, his counsel contended that his house was not vacant and that Safeguard controlled everyone beneath them from Montrelle to Steed and Hardaway. Counsel posited that the company was "sloppy" in its training, including teaching its vendors how to determine if a property was occupied. Counsel further argued that there was no court order allowing anyone into Smith's house and no evidence that Smith did anything but follow the instructions of Fifth Third with respect to paying the mortgage. Counsel highlighted the mortgage that Smith and Cantrell entered into with Fifth Third and noted that the mortgage was governed by the laws of the jurisdiction in which the property was located and nothing allowed any defendant into Smith's home that day.

¶ 53    Regarding the damages, in addition to compensation for the missing personal property and damage to the house, counsel argued that the facts warranted damages for emotional distress. Counsel posited that "[t]he anxiety of this event caused a domino effect. Every bump in the night caused fear, not just sleepless nights tossing and turning but fear that *** [Smith's] home will be broken in again at any moment." Counsel highlighted that the incident drove Smith and Cantrell to the "brink of divorce" but that counseling helped them. However, according to counsel, Smith's anxiety and fear eventually led him and his family to move away permanently from their house. Counsel observed: "Remember, after the break-in, Safeguard sent people to the Smith home 175 times after the break-in. After the break-in. They put this hardworking family through the ringer. For this there should be serious repercussions." At this point, defendants' counsel objected, but the trial court overruled the objection. Smith's counsel continued and asked "how do you quantify driving a family from their home in this day and age? *** What is that worth? Going to the Smith home 175 times after the break-in." Defendants' counsel continued to object to this line of argument, but the court overruled the objection and agreed with Smith's counsel that the argument

itself was relevant to the potential damages and separately noted that "[t]here was evidence on that." Smith's counsel continued: "While it is for you to decide, I can merely and only suggest an amount that would help to make him whole. Okay. So the actual amount is for you to decide. 175 times. What? $5,000 each time? What does that equal. 175. $10,000 each time? How do you quantify this?" Ultimately, counsel asserted that the jury should award Smith $1 million in total damages.

¶ 54    In defendants' closing argument, their counsel initially observed that Safeguard did not send vendors to anyone's property unless instructed to by Fifth Third. Counsel next highlighted the mortgage between Smith, Cantrell and Fifth Third, and pointed out that it explicitly allowed Fifth Third to inspect the property if it was vacant, abandoned or in default, and Fifth Third could take reasonable actions to protect and preserve the property if it was vacant. Counsel contended that, based on this clause of the mortgage and Smith and Cantrell being behind on their mortgage payments, Fifth Third was permitted to direct Safeguard and its vendors to view the property, determine if it was vacant, and if so, secure the property. Concerning Montrelle, counsel observed that he never went into Smith's house, never spoke to Smith and should not be held liable for anything that occurred that day. Concerning Steed and Hardaway, counsel argued that, at worst, they made an incorrect determination in good faith about the occupancy of Smith's property and posited that there was no evidence they stole any personal property from the house. Regarding Safeguard, counsel argued it was pure speculation that additional training would have changed the outcome of this case.

¶ 55    Additionally, defendants' counsel discussed Smith's purported damages, including those for emotional distress. Counsel noted that, in claiming his emotional distress damages, Smith had presented only his own self-serving testimony and never presented any evidence of psychological

treatment, medical appointments or anything of that nature to substantiate his claims. Counsel also argued that it was incredible that all of Smith's marriage issues were related to the January 31, 2014, incident and highlighted that their counseling started in 2012 well before the incident. Moreover, counsel observed that Smith could not even confirm whether he discussed the incident during his counseling sessions and asked: "How could these events have possibly played a role in their problems *** if the issue wasn't even brought up to the counselors?"

¶ 56                     E. Jury Verdict and Post-Jury Trial

¶ 57     During the jury's deliberations, it requested to see Plaintiff's Exhibit No. 22—the computer-generated spreadsheet of Safeguard's work orders for Smith's property. Following deliberations, the jury found in favor of Smith and against Safeguard, Montrelle, Hardaway and Steed. The jury's verdict did not differentiate between Smith's specific claims, but the jury awarded him $1,050 for damage to his property and $525,000 for the emotional distress he experienced from defendants' intrusion upon seclusion, for a total award of $526,050. The jury did not award Smith any damages for the alleged conversion of his personal property. The jury attributed 99.8 percent of the legal responsibility to Safeguard and 0.2 percent to Montrelle. Although the jury found against Hardaway and Steed, it did not allocate any legal responsibility to them. The trial court accordingly entered judgment in favor of Smith and against Safeguard and Montrelle, and it apportioned the jury's award: $1,052.10 from Montrelle and $524,997.90 from Safeguard.

¶ 58     The trial court subsequently entered an order on Smith's Fraud Act claims and found that Safeguard violated the Fraud Act, but that Montrelle, Hardaway and Steed did not. The court accordingly entered judgment in favor of Smith and against Safeguard. Concerning the damages, the court found that punitive damages were warranted because:

"[T]here was physical damage to the Property, the conduct affected the safety of the plaintiff's family, they were in a weaker financial position than the offending parties, and the conduct was more than just a mere accident. Safeguard was being paid for its services and was receiving an economic benefit from its conduct. This was not an unfortunate incident that happened unexpectedly and unintentionally. The bank instructed Safeguard to remove the flag from the account. Safeguard understood that the way they were preceding would result in innocent homes being entered. They issued 'oops' slips to its workers, as if the wrongful entry of someone's home was a necessary collateral damage of its business."

The court later added:

"Safeguard's cavalier protocol demonstrates a lack of concern as to the privacy of a mortgagee's home, and offends public policy established by statutes, ordinances and the common law. The practice is unfair to mortgagor customers. The conduct is outrageous because it was done with reckless indifference to the rights of others. The conduct warrants the imposition of punitive damages and attorney fees."

Consequently, the court awarded Smith $50,000 in punitive damages as well as attorney fees and costs. Later, the trial court granted Smith's petition for attorney fees and costs, and awarded him $297,417.01.

¶ 59    Safeguard and Montrelle subsequently filed a posttrial motion. In relevant part, they argued that the trial court's award of punitive damages should be vacated because, contrary to the court's findings, there was evidence at trial that Smith had defaulted on his mortgage, which thus permitted Safeguard and MWorks' presence at his property pursuant to the mortgage agreement. Additionally, Safeguard and Montrelle asserted that the testimony Kubovcik, the former employee

- 29 -

of Safeguard, should have been excluded and that the trial court improperly allowed Smith's counsel to argue to the jury about Safeguard's alleged 175 visits after January 31, 2014. Furthermore, Safeguard and Montrelle posited that the jury's damages award was excessive and sought a remittitur. Safeguard and Montrelle also argued that the court erred in giving the jury the instruction about the Forcible Entry Act (735 ILCS 5/9-101 *et seq.* (West 2014)). Lastly, Safeguard and Montrelle sought a setoff from the jury award in the amount of the settlement agreement entered into between Smith, Cantrell and Fifth Third.

¶ 60     The trial court denied Safeguard and Montrelle's motion in all respects. Concerning the amount of emotional distress damages, and their request for a remittitur, the court observed that Smith never enjoyed his home again after the incident. The court further noted that Smith observed "the 'preservationist' riding by his home approximately 175 times after the intrusion, which was documented by defendants and made part of the record." The court also highlighted the evidence that the stress and anxiety caused Smith to leave his home and thus, it found the jury's award was appropriate. Regarding Safeguard and Montrelle's contention about the improper closing argument and reference to Safeguard visiting Smith's house 175 times after the incident, the court remarked that they "ignore[d] the other counts" and improperly focused just on the intrusion upon seclusion claims. The court added that:

> "Defendants' efforts to bifurcate Safeguard's conduct—attempting to break the causal chain—would deprive the plaintiff from explaining the anguish and suffering that his family experienced. It was not that they were driving by the house, but that they had broken into his home once and were *also* driving by on such a consistent, frequent basis afterward." (Emphasis in original.)

Despite Safeguard and Montrelle arguing that the court improperly allowed Smith's counsel to reference the 175 visits during closing argument, the court concluded that there was no error in admitting the evidence at trial. The court also addressed its award of punitive damages and found that Safeguard through Montrelle, Steed and Hardaway entered Smith's house despite "evidence of renovation plainly in sight," a sign on the door indicating the property was occupied, security doors and a sophisticated alarm system that sounded upon their entry. And upon entering, according to the court, Steed and Hardaway destroyed the alarm system and poured antifreeze into Smith's pipes. The court concluded that these acts demonstrated "reckless indifference toward the rights of consumers" and demonstrated the need for punitive damages to deter future, similar conduct.

¶ 61    Smith filed an amended petition for attorney fees and costs for his counsel's services during the posttrial stage. The trial court granted the petition in the amount of $17,258.41. This appeal, with only Safeguard and Montrelle as appellants, followed.

¶ 62                                II. ANALYSIS

¶ 63                    A. Forcible Entry Act Instruction

¶ 64    We begin with appellants contention that the trial court improperly instructed the jury on the Forcible Entry Act (735 ILCS 5/9-101 *et seq.* (West 2014)) because the statute and its limited purpose was not at issue in the trial and the instruction rendered the jury instructions unclear and misleading. As noted, the court provided the jury with the following instruction:

"There was in force in the State of Illinois, at the time of the occurrence in question

a certain statute which provided that:

'no person shall make entry into lands or tenements except in cases where

entry is allowed by law, and in such cases, he or she shall not enter with

> force, but in a peaceable manner.' Illinois Forcible Entry and Detainer Act, 735 ILCS 5/9-101.
>
> If you decide that a party violated the statute on the occasion in question, you may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a party was negligent before and at the time of the occurrence."

¶ 65    This instruction was modeled after IPI Civil No. 60.01. An instruction concerning the violation of a statute should not be given unless there is sufficient evidence to support a finding that a violation has occurred (*Bell v. Hill*, 271 Ill. App. 3d 224, 230 (1995)), and the violation proximately caused the plaintiff's complained-of injury. *French v. City of Springfield*, 65 Ill. 2d 74, 81 (1976). The trial court has discretion when determining which instructions to provide to the jury. *Schultz v. Northeast Illinois Regional Commuter R.R. Corp.*, 201 Ill. 2d 260, 273 (2002). Even if an improper instruction is given, we may not reverse the court unless the instructions, taken as a whole, did not fully, fairly and comprehensively apprise the jury of the relevant legal principles. *Id.* at 273-74. In other words, the instructional error must have clearly misled the jury and prejudiced the appellant. *Id.* at 274.

¶ 66    Turning to the statute at issue, "[t]he common law permitted an individual who was rightfully entitled to enter upon land to do so with force and arms and retain possession by force." *Heritage Pullman Bank v. American National Bank & Trust Co. of Chicago*, 164 Ill. App. 3d 680, 686 (1987). But the Forcible Entry Act abrogated the common law's allowance of self-help and prevented any person from making "an entry into lands or tenements except in cases where entry is allowed by law, and in such cases he or she shall not enter with force, but in a peaceable manner." 735 ILCS 5/9-101 (West 2014). And thus, the Forcible Entry Act "provides the sole means for

settling a dispute over possession rights to real property." *Fortech, L.L.C. v. R.W. Dunteman Co., Inc.*, 366 Ill. App. 3d 804, 814 (2006). Indeed, the sole purpose of the statute is to determine the issue of possession. *Yale Tavern, Inc. v. Cosmopolitan National Bank*, 259 Ill. App. 3d 965, 971 (1994). To this end, the Forcible Entry Act prohibits attempts to obtain possession of a property through self-help and the use of force, including changing the locks of a property or locking someone out of his property. *Id.*

¶ 67    Despite the existence of the Forcible Entry Act and its prohibition of self-help, which oftentimes includes changing a property's locks, this case did not implicate the statute. There was no evidence presented at trial that any party—from Fifth Third to Safeguard to MWorks—was attempting to obtain legal possession of Smith's property. Rather, the critical issue in the case for purposes of this jury instruction was the mortgage entered into between Smith, Cantrell and Fifth Third, which provided that the "[l]ender may inspect the property if the property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned property." In *Schweihs v. Chase Home Finance*, *LLC*, 2016 IL 120041, ¶¶ 3-16, our supreme court decided a case that also involved Safeguard's vendors entering a house, though the property at issue was in the redemption period of foreclosure proceedings. In the case, the court asserted that, "[b]y removing one secondary lock on the premises, defendants were securing the property for entrance for repairs, not taking possession of the property for residential purposes." *Id.* ¶ 54. Our supreme court noted the "substantial difference" between a mortgagee's contractual right to enter a residence to secure a property and make repairs, and "the right to possession for residential purposes" addressed by Illinois' mortgage foreclosure law. *Id.* ¶ 57.

¶ 68    Akin to *Schweihs*, there is a critical difference between a mortgagee's contractual right to enter a residence to secure a property and make repairs, and the right to legal possession addressed

by the Forcible Entry Act. Nothing about this clause in Smith and Cantrell's mortgage agreement implicated legal possession of a property. And there was no evidence presented that Fifth Third through Safeguard through MWorks was attempting to take legal possession of Smith's property. The only evidence was that Fifth Third was attempting to secure a property that Safeguard and MWorks wrongly believed was vacant pursuant to the terms of Fifth Third's mortgage agreement with Smith and Cantrell. Because there was no evidence that appellants were attempting to use self-help to take legal possession of Smith's property, the trial court abused its discretion by providing the jury the instruction. See *Bell*, 271 Ill. App. 3d at 230 (stating that an instruction concerning the violation of a statute should not be given unless there is sufficient evidence to support a finding that a violation has occurred). However, as we have discussed, reversal is not automatic for an improper instruction. See *Schultz*, 201 Ill. 2d at 273-74. Instead, reversible error occurs only if the instruction clearly misled the jury and prejudiced the appellant. *Id.* at 274.

¶ 69    Despite the instructional error, we cannot say that it clearly misled the jury and prejudiced appellants. First, the instruction itself was not mandatory. The instruction informed the jury that, if it determined that appellants violated the Forcible Entry Act, it "may consider that fact together with all the other facts and circumstances in evidence in determining whether and to what extent, if any, a party was negligent before and at the time of the occurrence." See *Canel v. Topinka*, 212 Ill. 2d 311, 326 (2004) (remarking that the use of the word " 'may' " generally indicates a permissive, rather than mandatory, act). Indeed, because the instruction was permissive, not mandatory, we would be engaging in two steps of pure speculation: one, whether the jury found a violation of the statute occurred and two, if it did, whether it actually considered that fact in its deliberations.

¶ 70    Second, excluding the Forcible Entry Act instruction, the remaining instructions as a whole fully, fairly and comprehensively apprised the jury of the relevant legal principles. See *Schultz*, 201 Ill. 2d at 273-74. Third, the jury returned a general verdict form that did not distinguish the liability between the four causes of action—negligence, trespass, intrusion upon seclusion and conversion—against appellants. The damages, however, were itemized, and the jury found that the fair market value of the property Smith claimed was taken from him was $0, the damage to his property was $1050 and the emotional distress he experienced as a result of appellants' intrusion upon seclusion was $525,000. But because of the general verdict form, we have no way of knowing how the Forcible Entry Act instruction affected the jury's liability determination and damages award, particularly as it related to the damage of Smith's property. He sought an award of damages for the damage to his personal property based not only on claims of negligence, which the Forcible Entry Act instruction implicated, but also based on claims of trespass, which the Forcible Entry Act instruction did not implicate. Because of the general verdict form, it is impossible to know whether the damages award for the damage to his personal property was based on appellants' liability for negligence or trespass. See *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 491-92 (2002) (refusing to set aside a general verdict where the plaintiff alleged multiple theories of liability and the defendants did not submit special interrogatories to the jury because "there [was] no way of knowing on what theory the jury found" the defendants liable). For these reasons, we cannot say appellants were clearly prejudiced by the improper instruction, and thus, there was no reversible error based on the instruction.

¶ 71                                   B. Kubovcik's Testimony

¶ 72    Appellants next contend that the trial court erred by allowing Kevin Kubovcik, the former employee of Safeguard, to testify about the company's training and supervision of its vendors.

Appellants posit that Kubovcik's testimony was irrelevant, but if it had any probative value, that value was substantially outweighed by the danger of unfair prejudice and the possibility of misleading the jury. In addition, appellants posit that Kubovcik testified to inadmissible prior bad acts of Safeguard.

¶ 73     The admissibility of evidence always begins with the inquiry of whether that evidence is relevant. Ill. Rs. Evid. 401, 402 (eff. Jan. 1, 2011). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ill. R. Evid. 401 (eff. Jan. 1, 2011). If evidence is not relevant, it is inadmissible at trial. Ill. R. Evid. 402 (eff. Jan. 1, 2011). However, even relevant evidence may be deemed inadmissible at trial if its "probative value is substantially outweighed by the danger of unfair prejudice *** or misleading the jury," among other reasons. Ill. R. Evid. 403 (eff. Jan. 1, 2011). The trial court has broad discretion in determining whether evidence is relevant and admissible, and thus, its decision on evidentiary matters may only be reversed if it has abused that discretion. *Peach v. McGovern*, 2019 IL 123156, ¶ 25. An abuse of discretion occurs only where the court's ruling is unreasonable, arbitrary, or fanciful, or where no reasonable person would adopt the same view. *Blum v. Koster*, 235 Ill. 2d 21, 36 (2009). In analyzing whether an abuse of discretion has occurred, the question is not whether we would reach the same conclusion as the trial court (*State Farm Fire & Casualty Co. v. John*, 2017 IL App (2d) 170193, ¶ 18), but, rather, whether the court's ruling "exceeded the bounds of reason" or was "against logic." *Vanderhoof v. Berk*, 2015 IL App (1st) 132927, ¶ 84.

¶ 74     Kubovcik testified that he worked in Safeguard's legal department as a claim resolution specialist and fielded complaints about the company and its vendors. Kubovcik conceded that, in his role, he was not involved in training any of Safeguard's vendors, but nevertheless would have

to determine the level of training of vendors as part of his investigations. Additionally, he testified to knowing about other aspects of Safeguard's training procedures. It is true that the critical time period for this case was January 2014 and Kubovcik had not worked at Safeguard since April 2010, but "[r]emoteness is just a component of the traditional relevancy test for evidence." *Inman v. Howe Freightways, Inc.*, 2019 IL App (1st) 172459, ¶ 148. Here, being removed from the company for close to four years before the critical time period did not make his knowledge of the company's training protocols worthless. Indeed, Kubovcik testified to policies of Safeguard that other evidence showed were still in existence in January 2014. For instance, Safeguard still required its vendors to be easily identifiable by the public in appearance and with identification. And Safeguard still instructed its vendors to contact the company if they had concerns about the occupancy status of a property. Thus, Kubovcik still had knowledge of relevant Safeguard policies. Moreover, his testimony undoubtedly implicated important issues in the case of whether Safeguard sufficiently trained its vendors and exercised sufficient control over its vendors to prevent entries into occupied properties. As such, Kubovcik's testimony about Safeguard was relevant.

¶ 75    As noted, even relevant evidence may be deemed inadmissible at trial if its probative value is substantially outweighed by the risk of unfair prejudice or misleading the jury. See Ill. R. Evid. 403 (eff. Jan. 1, 2011). However, the risk of unfair prejudice or misleading the jury did not substantially outweigh the probative value of Kubovcik's testimony. Notably, appellants were able to cross-examine Kubovcik on multiple issues related to his testimony. For one, they were able to elicit that he was a disgruntled employee who left Safeguard because he did not like working there and was sued by the company for violating a confidentiality agreement. As such, appellants were fully able to explore his bias against the company. Similarly, appellants were able to elicit from Kubovcik that he had no personal knowledge whatsoever of any changes to Safeguard's policies

and training after he left the company. In fact, Kubovcik conceded he had no knowledge as to the content of the 2011 editions of Safeguard's training manuals, which were the manuals in effect for 2014. As such, any risk of unfair prejudice or misleading the jury was mitigated by the admissions made by Kubovcik on cross-examination. And thus, under the relevancy test, the trial court properly admitted Kubovcik's testimony.

¶ 76    Lastly, appellants posit that Kubovcik's remarks about him fielding complaints about Safeguard and its vendors from people across the country constituted improper testimony about prior bad acts. It is well-established that "[e]vidence of specific prior bad acts unrelated to a material issue is prohibited." *Sharma v. Zollar*, 265 Ill. App. 3d 1022, 1025, n. 4 (1994); see also *Plooy v. Paryani*, 275 Ill. App. 3d 1074, 1089 (1995) ("Evidence of misconduct other than that in issue is not properly admissible to establish a [party's] disposition to behave in a certain way.").

¶ 77    However, Kubovcik's brief testimony about fielding complaints about Safeguard and its vendors was only foundational testimony to explain what he did in his role as a claim resolution specialist in the legal department and how he knew what he knew about Safeguard. His testimony was not intended to show Safeguard's propensity to act in a certain way, as prior bad act testimony would. See *Plooy*, 275 Ill. App. 3d at 1089. Although appellants rely on *Timothy Whelan L. Associates, Ltd. v. Kruppe*, 409 Ill. App. 3d 359 (2011), to support their argument, that case is much different. In *Kruppe*, the trial court allowed the plaintiff—who was suing the defendant for breach of contract for failing to pay attorney fees—to present testimony that the defendant had failed to pay other professionals for their services. *Id.* at 360, 369. This included testimony from the plaintiff's owner who testified that he represented the defendant in a fee petition case, where the defendant did not want to pay another attorney, and testimony from an accountant who had not been paid for services rendered to the defendant. *Id.* at 369. The appellate court found that the trial

court abused its discretion in allowing this testimony because it was intended to "impugn [the] defendant's character in an attempt to show that he acted in conformity therewith when he allegedly declined to pay plaintiff for its services." *Id.* at 370. Unlike in *Kruppe*, Kubovcik never provided specific details of the complaints he fielded while working at Safeguard, and his testimony was not intended to show that Safeguard acted in conformity with any alleged bad character. Rather, the testimony was purely foundational to give background on Kubovcik's knowledge about Safeguard. Consequently, Kubovcik's testimony in this regard was not prior bad act testimony and not inadmissible on this basis.

¶ 78                                C. Closing Argument

¶ 79     Appellants next contend that, during closing argument, the trial court erred by allowing Smith's counsel to argue to the jury that Safeguard "sent people" to his property 175 times after the January 31, 2014, incident and by allowing counsel to ask the jury for damages for each of those visits. As previously noted, during Smith's closing argument, his counsel stated:

> "Remember, after the break-in, Safeguard sent people to the Smith home 175 times
> after the break-in. After the break-in. They put this hardworking family through the
> ringer. For this there should be serious repercussions. *** So how do you quantify
> driving a family from their home in this day and age? *** What is that worth?
> Going to the Smith home 175 times after the break-in. *** While it is for you to
> decide, I can merely and only suggest an amount that would help to make him whole
> Okay. So the actual amount is for you to decide. 175 times. What? $5,000 each
> time? What does that equal. 175. $10,000 each time? How do you quantify this?"

When appellants' counsel objected to various parts of this argument, Smith's counsel posited that the argument was relevant to the potential damages, and the court agreed while also noting that

there was evidence supporting the argument. According to appellants, by permitting Smith's counsel to make this line of argument, the court denied them a fair trial by allowing the jury to hear argument on an alleged 175 post-occurrence visits that bore no relation to the sole occurrence at issue in the case, that were not legally actionable and that had no support in the evidence.

¶ 80    The purpose of closing argument is to "assist the jury in fairly arriving at a verdict based on the law and the evidence." *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 948 (2000). During closing argument, counsel has wide latitude in his remarks and may comment on the evidence as well as any reasonable inferences from that evidence. *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 873 (2004). Axiomatically, remarks are improper if they are not based on the evidence or reasonable inferences therefrom. *Copeland*, 316 Ill. App. 3d at 948. If counsel exceeds the bounds of proper argument, reversal is not mandatory (*Compton*, 353 Ill. App. 3d at 873) because parties are not guaranteed a flawless trial free of errors. *Fortae v. Holland*, 334 Ill. App. 3d 705, 710 (2002). Instead, reversal is appropriate only if the improper comments substantially prejudiced the opposing party. *Compton*, 353 Ill. App. 3d at 873. In this context, substantial prejudice means that the opposing party was denied a fair trial (*Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84), or, in other words, the result of the trial would have been different absent the improper remarks. *Allen v. Sarah Bush Lincoln Health Center*, 2021 IL App (4th) 200360, ¶ 203. The trial court has discretion when determining the scope and character of a party's closing argument. *Simmons v. Garces*, 198 Ill. 2d 541, 571 (2002). As such, its determinations concerning closing argument will not be reversed absent an abuse of discretion. *Id.*

¶ 81    Two of appellants' principal assertions as to the impropriety of the argument from Smith's counsel are that his counsel essentially raised 175 new claims during the case's final hour that were not even legally actionable. We agree with appellants that these alleged visits were likely not

independently actionable. Intrusion upon seclusion is a claim within the broader tort of invasion of privacy. *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 33. In order to prove an intrusion upon seclusion, the plaintiff must demonstrate "(1) an unauthorized intrusion or prying into the plaintiff's seclusion; (2) an intrusion that is highly offensive or objectionable to a reasonable person; (3) that the matter upon which the intrusion occurs is private; and (4) the intrusion causes anguish and suffering." *Jacobson v. CBS Broadcasting, Inc.*, 2014 IL App (1st) 132480, ¶ 47. The essence of an intrusion upon seclusion is an "offensive prying into the private domain of another." *Lovgren v. Citizens First National Bank of Princeton*, 126 Ill. 2d 411, 417 (1989). Indeed, if the matter upon which the intrusion occurred is not private, there can be no cause of action for intrusion upon seclusion. *Jacobson*, 2014 IL App (1st) 132480, ¶ 47.

¶ 82   From the spreadsheet, there was no evidence that agents of Safeguard entered Smith's property, but rather only viewed the exterior of the property. As such, it is dubious that any of these alleged 175 post-incident visits could have been actionable under a claim for intrusion upon seclusion because there was no evidence that any private matters were intruded upon. See *Schiller v. Mitchell*, 357 Ill. App. 3d 435, 441 (2005) (holding that the trial court properly dismissed the plaintiffs' claim for intrusion upon seclusion where the defendants camera was merely "aimed at plaintiffs' garage, driveway, side-door area, and backyard" such that any passerby could have seen exactly what the defendants' camera observed). Even though these post-occurrence visits were likely not legally actionable, the purpose of the argument by Smith's counsel was not to inject new claims into the case, but rather increase Smith's award of emotional distress damages. Assuming that there was evidence that supported the argument, it was reasonable for counsel to highlight these post-occurrence visits because additional contact by Safeguard, if observed by Smith or he otherwise was aware of them, could have exacerbated the stress and anxiety suffered by him as a

result of the January 31, 2014, intrusion upon seclusion. See *Compton*, 353 Ill. App. 3d at 873 (remarking that attorneys have wide latitude in his remarks in closing argument).

¶ 83 However, while the purpose of highlighting the post-occurrence visits by Safeguard may have been proper, the problem with the remarks is that it was not based on any evidence from the trial or reasonable inferences therefrom. First, counsel's assertion that Safeguard visited Smith's house "175 times after the break-in" is a gross exaggeration of the evidence. Counsel's argument was based on Plaintiff's Exhibit No. 22, which was entered into evidence during trial. This exhibit was the computer-generated spreadsheet maintained by Safeguard in the regular course of business that listed every work order requested at Smith's house. A close examination of this exhibit shows that there were not 175 work orders or "times" in which "Safeguard sent people" to Smith's home after January 31, 2014, as counsel argued. Rather, there were only 142 work orders listed for Smith's property following January 31, 2014. The 175-number came from an estimate during Smith's testimony, where his counsel asked "[a]pproximately" how many inspections were on each page of the spreadsheet. Smith responded that there were 20 to 25 on the seven pages of the spreadsheet. Counsel then asked Smith what 7 times 25 equaled to which Smith responded 175. But this estimate contradicted the documentary evidence.

¶ 84 In addition to the 175-number being inaccurate by close to 20 percent, it is probable that, even though there were 142 work orders listed on the spreadsheet, there were not actually 142 visits by Safeguard to Smith's property after January 31, 2014. As testified to by Steve Meyer, Safeguard's vice president, he believed that some of work orders listed on the spreadsheet had been canceled and those were indicated where the occupancy status was marked "unknown" and there was no cost associated with the work order. Indeed, after January 31, 2014, there were four work orders in which the occupancy status of Smith's property was deemed unknown with zero

cost associated with the order. If there were 138 visits by Safeguard or 142 visits by Safeguard, that is not a significant difference, but there is a significant difference between 138 or 142 visits and 175 visits. See *Rush v. Hamdy*, 255 Ill. App. 3d 352, 359 (1993) ("Commentary in closing argument is limited to facts in evidence.").

¶ 85    Beyond the gross exaggeration of the amount of times Safeguard visited Smith's property after January 31, 2014, there is another problem with counsel's argument. There was no testimony from Smith that he actually observed evidence of these 138 or 142 visits. All Smith testified to in this regard was that Safeguard "still sent people out and they still [had] people coming out—I guess [*sic*] still saw door hangers." Smith, however, highlights in his brief that there was additional evidence of his knowledge that Safeguard continued to send people to his house, which he learned from speaking to the renovators of his house. During trial, Smith testified that: "Actually, I heard— Well, I shouldn't stay I heard but the renovators were like people came out and inspect it, came out and report it [*sic*]." However, appellants' counsel objected to this testimony, and the trial court sustained the objection "as to what the renovators said." Contrary to Smith's assertion on appeal, what he learned from the renovators about Safeguard sending people to his house was not admissible evidence. Thus, the only evidence that Smith was aware of Safeguard's continued visits to his property was based on the presence of door hangers. This, however, has problems of its own. For one, Smith never indicated how many times he observed these doors hangers and therefore how many of the 138 or 142 visits he was actually aware of. Additionally, Smith testified that he moved from the property 18 months after the January 31, 2014, incident, meaning he moved around July 31, 2015. According to Plaintiff's Exhibit No. 22—excluding the times in which the occupancy status was deemed unknown with zero corresponding cost and thus, the work orders were likely cancelled—Safeguard visited Smith's house 85 times between January 31, 2014, and

July 31, 2015, and 53 times after July 31, 2015. And there was no evidence presented at trial that, following Smith's move, he ever returned to the property or had any way of acquiring knowledge that Safeguard continued to visit his property. All of this is to say that, even viewing the evidence liberally in Smith's favor, he only could have had knowledge of 85 subsequent visits by Safeguard to his property. Undoubtedly, however, Smith could not have had knowledge of 175 visits, as argued by his counsel. The trial court's rationale for allowing the argument was that there was evidence supporting the argument. But because there clearly was not evidence or reasonable inferences therefrom supporting the argument, it was unreasonable for the court to allow such an argument. Consequently, the argument was improper, and the court abused its discretion by overruling the objection made by appellants' counsel and allowing Smith's counsel to make the argument. See *Blum*, 235 Ill. 2d at 36 (an abuse of discretion occurs where the court's ruling is unreasonable).

¶ 86    As we previously discussed, improper remarks during closing argument do not automatically necessitate reversal, as parties are not guaranteed flawless and error-free trials. *Compton*, 353 Ill. App. 3d at 873; *Fortae*, 334 Ill. App. 3d at 710. The critical inquiry is whether the improper argument from Smith's counsel substantially prejudiced appellants and denied them a fair trial. *Davis*, 2014 IL App (1st) 122427, ¶ 84; *Compton*, 353 Ill. App. 3d at 873.

¶ 87    During the closing argument, Smith's counsel attempted to have the jury quantify each subsequent visit by Safeguard into a dollar amount to increase his emotional distress damages. Counsel suggested to the jury that each visit might have been worth $5000 or even $10,000, but noted that the actual amount was for the jury to decide. However, counsel implored the jury to determine that number and multiple it by 175—for the 175 post-occurrence visits by Safeguard. When the jury rendered its verdict, it awarded Smith $525,000 in emotional distress damages on

his intrusion upon seclusion claims. Given counsel's argument and the numbers he used, the jury's award potentially, though not likely, indicated that it granted Smith $3000 per subsequent visit by Safeguard (as $525,000 divided by 175 is $3000). Perhaps it is just a coincidence, as Smith's counsel did not seek emotional distress damages for the subsequent visits alone, but also sought emotional distress damages for the January 31, 2014, incident itself. And, thus, it is likely that the jury's award of $525,000 in emotional distress damages was from a combination of Smith's stress and anxiety over the January 31, 2014, incident itself as well as the post-occurrence visits.

¶ 88    But when Smith's counsel made such a critical monetary argument to the jury by using a number that was completely unsupported by any evidence or reasonable inferences therefrom, we cannot say that argument did not substantially prejudice appellants. It is true that, during deliberations, the jury requested Plaintiff's Exhibit No. 22 and could have checked the math of Smith's counsel and his assertion of 175 post-occurrence visits. It is also true that the jury could have used its own recollection of the evidence to determine whether there was testimony to support Smith's knowledge of Safeguard's post-January 31, 2014, visits. Furthermore, it is indisputable that, prior the trial, the trial court instructed the jury that closing argument is only a "summary of what the attorneys believe they have shown" and that argument was not evidence. See *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 856 (2010) (finding that, under certain circumstances, an improper closing argument can be cured where "the trial court admonished the jury that closing arguments were not evidence, and that the jury should decide the case based on the evidence alone").

¶ 89    But Smith's counsel placed an exceedingly strong emphasis on the 175-number such that the jury's award of emotional distress damages was undoubtedly affected by the improper remarks. See *Allen*, 2021 IL App (4th) 200360, ¶ 203 (a defendant will be denied a fair trial based on an

improper closing argument where the result of the trial would have been different absent the improper remarks); *Konewko v. Advocate Health & Hospitals Corp.*, 2020 IL App (2d) 190684, ¶ 84 ("Reversal is warranted where undue emphasis was placed on the comment, such that the jury's verdict was affected by it."). Moreover, when the trial court overruled the objection from appellants' counsel, the court stated that it agreed with Smith's counsel that the argument itself was relevant to the potential damages and separately noted that "[t]here was evidence on that." Instead of simply overruling the objection and reiterating to the jury that closing arguments are a summary of what the parties' attorneys believe the evidence has shown and that any argument not supported by the evidence should be disregarded (see Illinois Pattern Jury Instructions, Civil, No. 1.01(C)[13] (revised June 2019)), the court potentially gave the jury the impression that the 175-number was accurate and borne out by the evidence in the case when, in reality, it was not. Because Smith's counsel placed an exceedingly strong emphasis on the 175-number and the court may have inadvertently substantiated that number with its comments, these two facts demonstrate that the improper argument by Smith's counsel substantially prejudiced appellants and denied them a fair trial, particularly on the damages portion.

¶ 90    As to the remedy for the improper and prejudicial argument from Smith's counsel, we may order a new trial on just the damages portion when "(1) the jury's verdict on the question of liability is amply supported by the evidence; (2) the questions of damages and liability are so separate and distinct that a trial limited to the question of damages is not unfair to the defendant; and (3) the record suggests" that the jury did not reach a compromise verdict or that the prejudicial error did not influence its finding as to liability. *Robbins v. Professional Construction Co.*, 72 Ill. 2d 215, 224 (1978). We find that these elements are fully satisfied such that a new trial on the damages portion only is an appropriate remedy. Consequently, we find the improper argument by Smith's

counsel warrants a new trial, but only on the damages. See *Ramirez v. City of Chicago*, 318 Ill. App. 3d 18, 26-32 (2000) (finding that an improper *per diem* argument during closing argument warranted a new trial on the damages only because the evidence amply supported the jury's liability finding, "the question of damages [was] so distinct from the matter of liability that a new trial as to damages alone would not be unfair to the defendant" and "the record contains no evidence whatsoever that the jury reached a compromise verdict or that the improper *per diem* argument influenced its finding as to liability").

¶ 91     Having concluded that a new trial on the damages portion only is warranted, we need not discuss appellants' further claim of error that the trial court improperly denied their motion for a remittitur of the $525,000 emotional distress damages for Smith's intrusion upon seclusion claims, as a new award of damages will result from the new trial on the damages.

¶ 92                                     D. Fraud Act Findings

¶ 93     We still must, however, discuss Safeguard's contention that the trial court erred in finding a violation of the Fraud Act and that the punitive damages imposed against it should be vacated because its wrongful conduct was not performed with malice, evil motive or reckless indifference toward Smith's rights. This is because the trial court, not the jury, heard Smith's claims against appellants for violations of the Fraud Act and the court's damages award for the violations of the Fraud Act were punitive rather than compensatory.

¶ 94     As an initial matter, although in its heading to this contention of error, Safeguard argues that the trial court erred in finding a violation of the Fraud Act, Smith posits that Safeguard forfeited the issue by failing to include any argument on the matter. We agree. Safeguard focuses its argument completely on the punitive damages issue, and while it does make scant references to the court's rationale for finding that its conduct was unfair under the Fraud Act, Safeguard cites to

no case law on the Fraud Act let alone any part of the Fraud Act itself. The Fraud Act bars "[u]nfair methods of competition and unfair or deceptive acts or practices *** in the conduct of any trade or commerce." 815 ILCS 505/2 (West 2014). To find a violation of the Fraud Act for unfair conduct, the plaintiff must show evidence that the defendant's practice (1) offends public policy, (2) is oppressive, unscrupulous, immoral or unethical, or (3) causes significant injury to consumers. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417-18 (2002). However, not all three elements must be satisfied. *Id.* at 418. Rather, a practice may be deemed unfair if that practice touches upon all three elements or touches upon one element so strongly. *Id.* Nowhere in Safeguard's brief do they cite any such law or argument on any such law. Consequently, to the extent that Safeguard argues that the court erred in finding it violated the Fraud Act, that contention is forfeited. See Ill. S. C. R. 341(h)(7) (eff. Oct. 1, 2020) (stating that "[a]rgument" shall contain "citation of the authorities" and that "[p]oints not argued are forfeited").

¶ 95    We now turn to the punitive damages issue. Punitive damages are not favored under Illinois law and reserved for those instances where there is a need to punish the offender and discourage the offender and others from acting in a similar manner in the future. *Loitz v. Remington Arms Co. Inc.*, 138 Ill. 2d 404, 414 (1990). The degree of malfeasance allowing for punitive damages is high, and they may only be awarded for conduct that is "outrageous" and "committed with an evil motive or a reckless indifference to the rights of others." *Tri-G*, 222 Ill. 2d at 264. In other words, punitive damages may not be "awarded for acts that constitute ordinary negligence, such as mere inadvertence, mistake, and errors of judgment." *Fogt v. 1-800-Pack-Rat, LLC*, 2017 IL App (1st) 150383, ¶ 83.

¶ 96    In determining the propriety of an award of punitive damages, we utilize a trifurcated standard of review. *Linhart v. Bridgeview Creek Development, Inc.*, 391 Ill. App. 3d 630, 641

(2009). The first step is to determine whether the particular cause of action at issue allows for punitive damages, which is a legal question we review *de novo*. *Id.* The second step is to determine whether the defendant's conduct was egregious enough to warrant the imposition of punitive damages, which we review under a manifest-weight standard of review. *Id.* A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the finding is unreasonable, not based on the evidence or arbitrary. *Hartney Fuel Oil Co. v. Hamer*, 2013 IL 115130, ¶ 17. Finally, the third step is to determine whether the trial court abused its discretion in imposing the damages. *Linhart*, 391 Ill. App. 3d at 641.

¶ 97    We begin with the first step and must determine whether the Fraud Act allows for punitive damages. Section 10a of the Fraud Act (815 ILCS 505/10a (West 2014)) provides that a plaintiff may be awarded economic damages as well as "any other relief which the court deems proper." Based on this language, this court has previously concluded that "it is undisputed that punitive damages are available" for violations of the Fraud Act (*Dubey v. Public Storage, Inc.*, 395 Ill. App. 3d 342, 356 (2009)), a conclusion that appellants concede.

¶ 98    Turning to the second step, we must determine whether Safeguard's conduct was egregious enough to warrant the imposition of punitive damages. Safeguard posits that its vendors entry into Smith's property would have been permissible under the mortgage agreement between him, Cantrell and Fifth Third if they were in default, which they were, and the property was determined to be vacant. Based on this clause in the mortgage, Safeguard claims the evidence did not show it conducted itself with malice, an evil motive or reckless indifference to Smith's rights, but rather it operated under the mistaken belief that the property was vacant.

¶ 99    Through the trial court's memorandum opinion and order on the Fraud Act claims, and its order denying Safeguard's posttrial motion, the court gave various reasons why punitive damages

were warranted against the company. One such rationale was that Safeguard, through its vendors, gave apology letters to homes they thought were vacant but were later determined to be occupied "as if the wrongful entry of someone's home was a necessary collateral damage of its business." Additionally, the court noted that, in the instant case, Safeguard, through MWorks, Steed and Hardaway, entered Smith's house despite clear evidence the house was occupied and in doing so, caused damage to his property. This conduct, according to the court, demonstrated Safeguard's reckless indifference toward Smith's rights and the public at large. Based upon the evidence at trial, we cannot say the opposite conclusion is clearly evident or the court's finding was unreasonable, not based on the evidence or arbitrary. See *Hartney*, 2013 IL 115130, ¶ 17. Safeguard's policy of having the apology letters on hand along with the trial being replete with evidence that Smith's house was under renovation and occupied was sufficient to warrant punitive damages. Although Meyer, Safeguard's assistant vice president, testified that Safeguard left the apology letters in less than one percent of cases, the very fact that Safeguard included the letters with the work orders demonstrated that Safeguard conducted itself, at times, recklessly. Additionally, there was other evidence demonstrating that Safeguard's training was lacking, such as having protocols when home security alarms were present. Although Michael testified such protocols existed, Montrelle, the owner of MWorks, testified that no such protocols existed. Moreover, there was evidence that Safeguard's supervision was lacking, such as ensuring its vendors wore professional attire with identification on the job. Consequently, there was ample evidence presented at trial for the trial court to conclude that punitive damages were warranted against Safeguard.

¶ 100    Lastly, we find no abuse of discretion in the trial court's ultimate imposition of $50,000 of punitive damages. As noted, the Fraud Act allows for punitive damages and Safeguard's conduct

was egregious enough to warrant them. Imposing $50,000 in damages against Safeguard is an appropriate penalty to ensure that Safeguard and other similar companies change their procedures and training to prevent such future improper conduct. Consequently, we find no error in the court's imposition of $50,000 in punitive damages.

¶ 101                                E. Setoff

¶ 102   Lastly, we must discuss appellants contention that the trial court erred by denying them a setoff from Smith's compensatory damages award commensurate with the amount of the settlement entered into between him, Cantrell and Fifth Third, as this issue could arise again following the new trial on the damages.

¶ 103   Legally, there are two types of setoffs. *Thornton*, 237 Ill. 2d at 113. One, which is not relevant to this case, involves when a defendant has a counterclaim against the plaintiff, and the defendant claims the plaintiff's conduct should result in a reduction of the plaintiff's damages award. The other type of setoff, which is relevant to this case, occurs when the defendant requests "a reduction of the damage award because a *third party* has already compensated the plaintiff for the same injury." (Emphasis in original.) *Id.* This situation occurs when a codefendant, who would have been liable to the plaintiff for contribution, has settled with the plaintiff. *Id.* Although this type of setoff may be raised at any time and cannot be forfeited (*id.* at 113-114), appellants raised their request for a setoff before trial as an affirmative defense.

¶ 104   When a defendant requests a setoff under the second situation, the Joint Tortfeasor Contribution Act (740 ILCS 100/0.01 *et seq.* (West 2014)) governs the request. Section 2(c) of the statute provides:

"When a release or covenant not to sue or not to enforce judgment is given in good faith to one or more persons liable in tort arising out of the same injury or the same

wrongful death, it does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide but it reduces the recovery on any claim against the others to the extent of any amount stated in the release or the covenant, or in the amount of the consideration actually paid for it, whichever is greater." 740 ILCS 100/2(c) (West 2014).

The purpose of this section is to prevent a plaintiff from obtaining a double recovery. *Thornton*, 237 Ill. 2d at 116. Additionally, this section " 'ensures that a nonsettling party will not be required to pay more than its *pro rata* share of the shared liability.' " *Id.* (quoting *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 368 (1995)). "Thus, under section 2(c), it has been held that a settlement between one tortfeasor and the plaintiff will result in an equal setoff in amount against the recovery a nonsettling tortfeasor receives." *Pasquale*, 166 Ill. 2d at 368. Where a plaintiff has suffered one injury, he can only receive one satisfaction for that injury "irrespective of the availability of multiple theories that recovery for the injury can be sought under." *Dial v. City of O'Fallon*, 81 Ill. 2d 548, 558 (1980). Stated otherwise, "if a party is injured by another he can bring the actions under several theories, *i.e.*, negligence, product liability, intentional tort, etc.; however, he will only be eligible for one recovery for his injury when seeking compensatory tort damages." *Id.* The nonsettling party has the burden to prove "what portion of a prior settlement was allocated or attributable to its share of the liability." *Thornton*, 237 Ill. 2d at 116. Whether the defendant is entitled to a setoff is a legal question that we review *de novo. Id.* at 115-16.

¶ 105   In this case, Smith and Cantrell jointly sued Fifth Third for breach of contract, negligence, a violation of the Fraud Act, trespass and intrusion upon seclusion. Meanwhile, they sued the remaining defendants for negligence, a violation of the Fraud Act, trespass, intrusion upon seclusion and conversion. When Fifth Third settled, it did so with both Smith and Cantrell, but

there was no allocation of the settlement proceeds between them. Later in the litigation after they reached their settlement with Fifth Third, Cantrell voluntarily dismissed her claims against the remaining defendants. As such, all of the damages following the joint bench-and-jury trial were awarded to Smith.

¶ 106   Illustrative of this situation is *Kipnis v. Meltzer*, 253 Ill. App. 3d 67, 67 (1993), where a husband and wife sued two doctors for injuries the wife sustained under their care. Before trial, the plaintiffs settled with one of the doctors for $300,000, and the husband then voluntarily dismissed his claim against the other doctor. *Id.* at 67-68. The wife's claim against the other doctor—the lone remaining defendant—went to a jury trial, where she obtained a $20,000 verdict. *Id.* at 68. Following the trial, the defendant sought a setoff against her in the amount of the settlement with the first doctor. *Id.* The trial court denied his request, and he appealed. *Id.* In affirming the trial court's denial, the appellate court found that "the settlement with a joint tortfeasor was unallocated between plaintiff and her husband" and "[t]herefore, defendant cannot prove how much of the $300,000 settlement with [the first doctor] was attributable to [the] plaintiff's claims as opposed to [her husband's]." *Id.* at 71. And consequently, the appellate court concluded that "defendant has no measurable way of arriving at the amount which should be set off against [the plaintiff's] verdict" and "nor do we." *Id.* at 71-72. The court further recognized that such a result did not contravene Illinois' public policy against allowing double recoveries because the defendant had failed to show the plaintiff had been compensated twice. *Id.* at 72.

¶ 107   Although in their fourth amended complaint, Smith and Cantrell alleged identical causes of action against appellants and partially sought damages for the same injuries, such as an amount equal to the necessary repairs to their property and the replacement costs of the items stolen from their property, they nevertheless sought emotional distress damages. Like in *Kipnis*, the settlement

with Fifth Third was unallocated between Smith and Cantrell, and thus, appellants cannot prove how much of the settlement with Fifth Third was attributable to Smith's claims, including his claim for emotional distress, as opposed to Cantrell's claims, which included an independent claim for emotional distress. As a result, appellants have "no measurable way of arriving at the amount which should be set off against" Smith's verdict, and likewise, we do not. *Id.* at 71-72. Because of this, there is no concern that Smith is being compensated twice for the same injury. Appellants are therefore not entitled to a setoff, and the trial court properly denied their request for one.

¶ 108                                     III. CONCLUSION

¶ 109   For the foregoing reasons, we reverse the judgment of the circuit court of Cook County and remand for a new trial on the damages only.

¶ 110   Reversed and remanded.